No. 22-1056 (consolidated with No. 22-1058)

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

ELECTRIC ENERGY, INC., *et al.*,

*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*,

*Respondents*.

**On Petition for Review of Final Agency Action of the
United States Environmental Protection Agency**

**BRIEF OF THE CHAMBER OF COMMERCE OF THE UNITED STATES
OF AMERICA AS *AMICUS CURIAE* IN SUPPORT OF PETITIONERS AND
VACATUR**

Nash E. Long
HUNTON ANDREWS KURTH LLP
101 South Tryon Street, Suite 3500
Charlotte, NC 28280
nlong@HuntonAK.com
(704) 378-4728

Elbert Lin
*Counsel of Record*
HUNTON ANDREWS KURTH LLP
951 East Byrd Street, East Tower
Richmond, VA 23219
elin@HuntonAK.com
(804) 788-8200

Andrew R. Varcoe
Stephanie A. Maloney
U.S. CHAMBER LITIGATION CENTER
1516 H Street, NW
Washington, DC 20062
(202) 463-5337

*Counsel for* Amicus Curiae

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

In accordance with D.C. Circuit Rule 28(a)(1), *amicus curiae* states as follows:

## I. Parties and *Amici Curiae*

Except for the following, all parties, intervenors, and *amici* appearing in this Court are listed in the Brief for Petitioners at pages i-ii:

*Amicus curiae* in support of Petitioners is the Chamber of Commerce of the United States of America.

## II. Rulings Under Review

References to the rulings at issue appear in the Brief for Petitioners at pages ii-iv.

## III. Related Cases

Two consolidated cases (Case Nos. 22-1056 and 22-1058) seek review of the agency action challenged here. *Amicus curiae* is unaware of any other related cases.

## CORPORATE DISCLOSURE STATEMENT

The Chamber of Commerce of the United States of America ("Chamber") states that it is a non-profit, tax-exempt organization incorporated in the District of Columbia. The Chamber has no parent corporation, and no publicly held company has 10% or greater ownership in the Chamber.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES………..i

CORPORATE DISCLOSURE STATEMENT……………………………….ii

TABLE OF CONTENTS……………………………………………………….iii

TABLE OF AUTHORITIES……………………………………………….v

GLOSSARY………………………………………………………………ix

INTRODUCTION AND INTEREST OF *AMICUS CURIAE*……………………..1

STATUTES AND REGULATIONS…………………………………………….2

SUMMARY OF THE ARGUMENT……………………………………………3

ARGUMENT………………………………………………………………….5

I.     Agencies Often Seek to Use Purported Guidance to Evade Judicial Review and Circumvent Fundamental Administrative-Law Principles….5

II.    Framing Agency Action as Guidance Is Not Sufficient to Escape Judicial Review……………………………………………………………………9

       A. Agency Guidance That Constitutes Final Agency Action May Be Immediately Reviewed…………………………………………………9

       B. The Purported CCR Guidance Constitutes Final Agency Action Subject to Immediate Judicial Review……………………………13

III.   Framing Agency Action as Guidance Is Not Sufficient to Escape Notice and Comment……………………………………………………………...17

       A. Purported Guidance That Creates Binding Norms Is a Legislative Rule Subject to Notice and Comment………………………………17

       B. The Purported CCR Guidance Is a Legislative Rule………………..20

IV.    Agencies Must Thoroughly Consider Reliance Interests and Afford Regulated Parties Due Process When Adopting New Legal Positions…22

       A. EPA Abandoned Its Prior Legal Position Without Adequately Taking Into Account Reliance Interests……………………………………..23

       B. This Court Owes EPA's Legal Interpretations No Deference………25

       C. EPA Cannot Constitutionally Apply the Purported CCR Guidance to Petitioners for Past Behavior…………………………………………...26

CONCLUSION…………………………………………………………...29

CERTIFICATE OF COMPLIANCE…………………………………………...30

CERTIFICATE OF SERVICE……………………………………………31

# TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Gardner*, 387 U.S. 136 (1967)…………………………6, 9, 12, 16

*Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106 (D.C. Cir. 1993)……………………………………………..18, 19, 20, 21, 22

*Appalachian Power Co. v. E.P.A.*, 208 F.3d 1015 (D.C. Cir. 2000)...6, 7, 14, 17, 21

*Auer v. Robbins*, 519 U.S. 452 (1997)…………………………………………26

*Bennett v. Spear*, 520 U.S. 154 (1997)………………………..10, 11, 12, 13, 15, 16

*Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627 (D.C. Cir. 2019)…………11, 12

*Caring Hearts Personal Home Servs., Inc. v. Burwell*, 824 F.3d 968 (10th Cir. 2016)……………………………………………………………………7

*Catholic Health Initiatives v. Sebelius*, 617 F.3d 490 (D.C. Cir. 2010)……………………………………………18, 19, 20, 21

*Cent. Tex. Tel. Coop., Inc. v. FCC*, 402 F.3d 205 (D.C. Cir. 2005)…………….....18

*Ciba-Geigy Corp. v. U.S. EPA*, 801 F.2d 430 (D.C. Cir. 1986)………11, 12, 13, 15

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 (2020)……………………………………………5, 6, 9, 22, 24, 25

*Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1 (D.C. Cir. 2011)…………………………………………………………..20

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016)……………………22, 24

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)…………………..23, 24

*FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012)…………………...27, 28

*Flagstaff Broad. Found. v. FCC*, 979 F.2d 1566 (D.C. Cir. 1992)………………23

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010)…...8

*Gates & Fox Co. v. Occupational Safety & Health Review Comm'n*, 790 F.2d 154 (D.C. Cir. 1986)……………………………………………………………27

*Gen. Elec. Co. v. U.S. EPA*, 53 F.3d 1324 (D.C. Cir. 1995)…………………..26, 27

*Gen. Motors Corp. v. Ruckelshaus*, 742 F.2d 1561 (D.C. Cir. 1984) (en banc)….17

*Hoctor v. USDA*, 82 F.3d 165 (7th Cir. 1996)………………….......18, 19, 21, 22

*Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250 (D.C. Cir. 2005)…………………………………………………8

*John Doe, Inc. v. Drug Enforcement Admin.*, 484 F.3d 561 (D.C. Cir. 2007)……13

*Kisor v. Wilkie*, 139 S. Ct. 2400 (2019)…………………………….........23, 26

*La. Fed. Land Bank Ass'n, FLCA v. Farm Credit Admin.*, 336 F.3d 1075 (D.C. Cir. 2003)…………………………………………………………………………6

*Mach Mining, LLC v. EEOC*, 575 U.S. 480 (2015)………………………......8

*McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317 (D.C. Cir. 1988)……18, 19

*MediNatura, Inc. v. Food & Drug Admin.*, 998 F.3d 931 (D.C. Cir. 2021)………………………………………………………..10, 14, 24

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29 (1983)………………………………………………………23

*Nat'l Automatic Laundry & Cleaning Council v. Shultz*, 443 F.2d 689 (D.C. Cir. 1971)……………………………………………………10, 11, 12, 14

*Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243 (D.C. Cir. 2014)…….10, 12, 16, 17

*Pac. Gas & Elec. Co. v. Fed. Power Comm'n*, 506 F.2d 33 (D.C. Cir. 1974)……………………………………………………………8, 18, 19

*Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92 (2015)………………..6, 18, 19, 20, 22

*Sackett v. EPA*, 566 U.S. 120 (2012)…………………………………………12, 15

*Sierra Club v. EPA*, 955 F.3d 56 (D.C. Cir. 2020)……………………………12, 16

*Student Loan Mktg. Ass'n v. Riley*, 104 F.3d 397 (D.C. Cir. 1997)…………..12, 13

*Sw. Airlines Co. v. U.S. Dep't of Transp.*, 832 F.3d 270 (D.C. Cir. 2016)……….11

*Syncor Int'l Corp. v. Shalala*, 127 F.3d 90 (D.C. Cir. 1997)……………………..18

*Trinity Broad. of Fla., Inc. v. FCC*, 211 F.3d 618 (D.C. Cir. 2000)………….27, 28

*U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590 (2016)……………..12, 15

*United States v. Chrysler Corp.*, 158 F.3d 1350 (D.C. Cir. 1998)……………23, 27

*United States v. Picciotto*, 875 F.2d 345 (D.C. Cir. 1989)………………………..19

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001)………………..10, 11, 15

**Constitutional Provisions**

U.S. Const. amend. V…………………………………………………………….26

## Federal Statutes

5 U.S.C.

§ 551(13)………………………………………………………………...10

§ 553(b)(A)…………………………………………………………….....6

§ 553(b)-(c)……………………………………………………………...6

§ 704………………………………………………………………9, 10, 16

§ 706(2)(A)……………………………………………………………...22

42 U.S.C.

§§ 6901 *et seq*...…………………………………………………………ix

§ 6907(a)(3)……………………………………………………………...16

§ 6911(a)………………………………………………………………...13

§ 6928(a)(1)……………………………………………………………...20

§ 6976(a)………………………………………………………………...16

## Federal Regulations

40 C.F.R.

pt. 257……………………………………………………………………..2

§ 1.47…………………………………………………………………….13

§§ 257.96-.98……………………………………………………………25

§ 257.102(c)……………………………………………………………...9

§ 257.102(d)(1)(i)………………………………………………………..21

§ 257.102(d)(1)(v)………………………………………………………24

§ 257.102(i)(4)…………………………………………………………...25

§ 257.103………………………………………………………………...28

§ 257.104(a)(2)…………………………………………………………..25

9 C.F.R.

§ 3.125(a)………………………………………………………………..22

**Federal Register**

Hazardous and Solid Waste Management System; Disposal of Coal Combustion Residuals From Electric Utilities, Final Rule, 80 Fed. Reg. 21,302 (Apr. 17, 2015)...............................................................1, 9, 21, 24, 25

Recommendations of the Administrative Conference Regarding Administrative Practice and Procedure, 57 Fed. Reg. 30,101 (July 8, 1992)...................8


**Court Rules**

D.C. Cir. R.

    28(a)(1)........................................................................................i

    32(e)(1)......................................................................................30

Fed. R. App. P.

    32(a)(5)-(6)................................................................................30

    32(f).........................................................................................30


**Miscellaneous**

Compl., *Mobile Baykeeper, Inc. v. Ala. Power Co.*, No. 1:22-cv-382-KD-B (S.D. Ala.), ECF 1 (complaint filed Sept. 26, 2022)...................................15

Nicholas R. Parrillo, *Federal Agency Guidance and the Power to Bind: An Empirical Study of Agencies and Industries*, 36 YALE J. ON REG. 165 (2019)........................................................................................7

Richard J. Pierce, Jr., *Distinguishing Legislative Rules From Interpretive Rules*, 52 ADMIN. L. REV. 547 (2000)...................................................6

Robert A. Anthony*, Interpretive Rules, Policy Statements, Guidances, Manuals, and the Like—Should Federal Agencies Use Them to Bind the Public?*, 41 DUKE L.J. 1311 (1992)................................................6, 14

Stephen M. Johnson, *Good Guidance, Good Grief!*, 72 MO. L. REV. 695 (2007)........................................................................................6

# GLOSSARY

APA                    Administrative Procedure Act

CCR                  Coal combustion residuals

EPA                  Environmental Protection Agency

RCRA               Resource Conservation and Recovery Act of 1976, 42 U.S.C. §§ 6901 *et seq*.

## INTRODUCTION AND INTEREST OF *AMICUS CURIAE*[1]

It is not uncommon for agencies to try to coerce regulated parties to comply with a new policy without undergoing the Administrative Procedure Act's ("APA's") required notice and comment process or acquiescing in judicial review. This Court has refused to enable agencies to disguise binding rules as so-called guidance and, in so doing, to evade the APA and circumvent judicial review. Instead, this Court has properly scrutinized the substance of agency action over its form.  It should do so again here.

This case is the latest example of an agency seeking to sidestep the APA and this Court.   On January 11, 2022, the U.S. Environmental Protection Agency ("EPA") posted a website press release (Pet. App. 12)[2] to announce "[k]ey [s]teps" in its enforcement of the Resource Conservation and Recovery Act ("RCRA").  The press release, along with several proposed decisions and letters signed the same day and cited therein (together, "the Purported CCR Guidance"), articulated the agency's controlling view of the governing law.  EPA's position is inconsistent with EPA's

---

[1] *Amicus curiae* states that no counsel for any party authored this brief in whole or in part and no entity or person, aside from *amicus curiae*, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief.  *Amicus curiae* has filed an unopposed motion for leave to file this brief.

[2] "Pet. App." refers to the Attachments to Petitioners' Petition for Review, ECF No. 1942595, in Case No. 22-1056.

"2015 Rule," *see* Hazardous and Solid Waste Management System; Disposal of Coal Combustion Residuals ["CCR"] From Electric Utilities, Final Rule, 80 Fed. Reg. 21,302 (Apr. 17, 2015) (codified at 40 C.F.R. pt. 257), but EPA plainly expects regulated entities and state regulators to comply with it.

The Chamber of Commerce of the United States of America ("Chamber") is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the business community.

This case involves such an issue. The Chamber submits this brief because it has a strong interest in ensuring that courts hold agencies to the APA's requirements when they dress up new rules as informal guidance. Most members of the Chamber are regulated by federal agencies in multiple respects. It is important to the Chamber that agencies are not able to avoid judicial review of their actions, and that agencies comply with the APA.

## STATUTES AND REGULATIONS

All applicable statutes are included in the Petitioners' addendum.

## SUMMARY OF THE ARGUMENT

**I.** For binding agency rules, the availability of judicial review and the requirement of notice and comment rulemaking promote key values of our democracy, including reasoned and accountable decisionmaking, sound governance, and fairness. Agencies, though, sometimes seek to skirt these requirements by issuing de facto regulations in the form of "guidance." This Court has the power and duty generally, and in this case specifically, to rein in agencies' attempts to evade judicial oversight and the APA's protections.

**II. A.** Merely labeling agency action as guidance does not excuse it from immediate judicial review. By default, all agency action is generally reviewable so long as it is final. Agency action qualifies as final when it represents the consummation of the agency's decisionmaking process and triggers legal consequences. Supposed guidance can, and often does, satisfy both criteria.

**B.** The Purported CCR Guidance is final agency action. Endorsed by a high-ranking EPA official and implemented by regional offices nationwide, the Purported CCR Guidance is not tentative, but rather reflects the agency's settled view. Moreover, the Purported CCR Guidance has created immediate obligations for regulated entities, like Petitioners, who explain that it requires them to undertake costly expenses to remove all CCR from impoundments (for which they previously

had the option of closing in place with appropriate monitoring and controls), or else risk severe penalties.

**III. A.** Merely labeling or issuing agency action as guidance does not excuse it from notice and comment requirements, either. Agency actions can generally be categorized as interpretive rules, general statements of policy, or legislative rules. But the category into which an agency action falls is not determined simply by what the agency calls it. Rather, the determination is ultimately based on the substance of the agency action, as well as its legal and practical consequences. Legislative rules, which are subject to notice and comment, create binding requirements that control behavior with the force and effect of law.

**B.** The Purported CCR Guidance is a legislative rule. It creates a new binding requirement for CCR unit operators and state regulators. Moreover, it does not merely seek to ascertain the meaning of the earlier 2015 Rule; it goes farther and adopts a bright-line approach to execute the 2015 Rule's case-by-case standards, eliminating a compliance option made available by the Rule for an entire category of facilities.

**IV.** The APA and the Due Process Clause further restrain agency efforts to vary from prior rules, as EPA is seeking to do here.

**A.** Departing from an earlier agency position requires a recognition of the change, as well as an explanation that acknowledges and weighs serious reliance

interests generated by the prior position. Here, EPA altered Petitioners' legal obligations in the Purported CCR Guidance without any acknowledgement of its change in position, much less careful consideration of Petitioners' reliance interests based on the 2015 Rule.

**B.** To the extent this Court deems the Purported CCR Guidance an interpretation of an ambiguous regulation—and it should not—EPA is owed no deference. Although agencies' interpretations of their own rules can receive deference, such deference is unavailable when an agency's new interpretation would cause unfair surprise, as is true here.

**C.** Finally, agencies cannot, consistent with the Due Process Clause, retroactively apply new guidance to deprive regulated parties of property unless the parties had fair notice of what the law required of them. The potential civil liability, legal penalties, and permit denials that accompany the Purported CCR Guidance trigger this further limitation on EPA's actions here.

## ARGUMENT

### I. Agencies Often Seek to Use Purported Guidance to Evade Judicial Review and Circumvent Fundamental Administrative-Law Principles

The APA "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020) (internal quotation marks and citation omitted). Before an agency can create legally binding (or

"legislative") rules, the APA requires that an agency give the public "notice" of, and "an opportunity to" comment on, the proposed rule. 5 U.S.C. § 553(b)-(c). When the process is complete, the APA provides a "basic presumption of judicial review" of the final rule. *Regents*, 140 S. Ct. at 1905 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967)).

By design, these processes make it more difficult for agencies to issue binding rules than nonbinding guidance. Notice and comment can be "long and costly," Richard J. Pierce, Jr., *Distinguishing Legislative Rules From Interpretive Rules*, 52 ADMIN. L. REV. 547, 550 (2000), as regulators must often read extensive comments, Stephen M. Johnson, *Good Guidance, Good Grief!*, 72 MO. L. REV. 695, 701 n.26 (2007), and prepare appropriate responses, *La. Fed. Land Bank Ass'n, FLCA v. Farm Credit Admin.*, 336 F.3d 1075, 1080 (D.C. Cir. 2003). Judicial review can then undo those years of work and, where injunctions or stays are granted, even prevent the rules from ever taking effect. In contrast, the process for adopting "interpretative rules" (also called "interpretive rules") or "general statements of policy," 5 U.S.C. § 553(b)(A); *see Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 n.1 (2015)—both nonbinding—is "significantly quicker and less expensive." Johnson, *supra* at 701.

It is unsurprising, then, that agency efforts to sidestep these processes and bind the public through "guidance" are now "familiar." *Appalachian Power Co. v. E.P.A.*, 208 F.3d 1015, 1020 (D.C. Cir. 2000); *see also* Robert A. Anthony*,*

*Interpretive Rules, Policy Statements, Guidances, Manuals, and the Like—Should Federal Agencies Use Them to Bind the Public?*, 41 DUKE L.J. 1311, 1316 (1992) (documenting examples). With a "broadly worded statute" in hand, the agency "follows with regulations containing broad language, open-ended phrases, ambiguous standards and the like." *Appalachian Power*, 208 F.3d at 1020. Then come years of purported guidance "explaining, interpreting, defining and often expanding the commands in the regulations. One guidance document may yield another and then another and so on. … Law is made, without notice and comment, without public participation, and without publication in the Federal Register or the Code of Federal Regulations" as the agency "simply … post[s] its new guidance … on its web site." *Id.*

Today, "[g]uidance comes in an endless variety of labels and formats," including press releases, letters, bulletins, or fact sheets. Nicholas R. Parrillo, *Federal Agency Guidance and the Power to Bind: An Empirical Study of Agencies and Industries*, 36 YALE J. ON REG. 165, 167 (2019). The page count "is estimated to dwarf that of actual regulations by a factor of twenty, forty, or even two hundred." *Id.* at 167-69. "[N]o one seems sure how many … hundreds of thousands (or maybe millions) of pages" of guidance that is nonbinding in name only "might be found floating around these days." *Caring Hearts Personal Home Servs., Inc. v. Burwell*, 824 F.3d 968, 969 (10th Cir. 2016) (Gorsuch, J.).

As many have observed, the practice of issuing binding pronouncements in the form of guidance is "concern[ing]," Recommendations of the Administrative Conference Regarding Administrative Practice and Procedure, 57 Fed. Reg. 30,101, 30,103 (July 8, 1992), particularly given agencies' "vast power [that] touches almost every aspect of daily life," *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 499 (2010). The notice and comment process promotes important democratic values. Public participation facilitates oversight and transparency concerning the agency's work and improves public acceptance of the end-product. *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259 (D.C. Cir. 2005). And on the agency's end, the process "insures a thorough exploration of the relevant issues" to achieve sounder policy. *Pac. Gas & Elec. Co. v. Fed. Power Comm'n*, 506 F.2d 33, 39 (D.C. Cir. 1974).

Likewise, judicial review serves as a critical check on agency action. Congress created a "strong presumption favoring judicial review" of an agency's final decisions, precisely because "legal lapses and violations occur, and especially so when they have no consequence." *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 489 (2015). Indeed, one of the purposes of notice and comment is to create a record that can be reviewed by courts. *Int'l Union*, 407 F.3d at 1259.

Federal courts thus must carefully scrutinize agencies' attempts to reach over the APA's guardrails and to escape judicial review—including in this case. The

press release and other materials at issue here take the form of mere guidance. But in substance, they communicated to state regulators and CCR unit operators nationwide that EPA expects all operators of "surface impoundments or landfills" in which "coal ash [is] in contact with groundwater," Pet. App. 14, to undertake the "expens[ive] and difficult[]" process of removal and relocation, 80 Fed. Reg. at 21,412.[3] As explained more fully below, this Court should review this purported guidance and hold it unlawful for violating the APA and fundamental principles of fairness.

## II. Framing Agency Action as Guidance Is Not Sufficient to Escape Judicial Review

### A. Agency Guidance That Constitutes Final Agency Action May Be Immediately Reviewed

There is no categorical exception to judicial review for purported guidance. All "agency action" is "presumpti[vely]" subject to "judicial review," *Abbott Labs.*, 387 U.S. at 140, unless a "statute 'preclude[s]' review," or "the 'agency action is committed to agency discretion by law,'" *Regents*, 140 S. Ct. at 1905. Otherwise, challengers generally may seek immediate review of any "agency action" so long as it is "final." 5 U.S.C. § 704. Purported guidance often qualifies as final agency action.

---

[3] The 2015 Rule uses the phrase "removal and decontamination," 40 C.F.R. § 257.102(c), but this phrase ignores the necessity of relocating the CCR to a new location upon removal.

1. To begin, all "guidance" is "agency action." 5 U.S.C. § 704. The term "agency action" is broad and "includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). Thus, "*every* manner in which an agency may exercise its power," *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001) (emphasis added), including "an[] agency's interpretation" of the laws it is charged with administering, *Nat'l Automatic Laundry & Cleaning Council v. Shultz*, 443 F.2d 689, 698 (D.C. Cir. 1971), constitutes "agency action."

2. "Guidance" also can be "final," as this Court has often held. It is well settled that agency action is "final" when the act (a) "mark[s] the 'consummation' of the agency's decisionmaking process," and (b) is "one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted); *MediNatura, Inc. v. Food & Drug Admin.*, 998 F.3d 931, 938 (D.C. Cir. 2021).

Critically, this is a "'pragmatic' and 'flexible'" inquiry. *MediNatura*, 998 F.3d at 938 (citation omitted). It does not turn on "conventional procedural accoutrements," *Whitman*, 531 U.S. at 479; *Nat'l Automatic Laundry*, 443 F.2d at 698-99, 702, what the agency titles the action, *see Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 250 (D.C. Cir. 2014) (Kavanaugh, J.), or in what medium the agency

communicates its message, *see Ciba-Geigy Corp. v. U.S. EPA*, 801 F.2d 430, 438 n.9 (D.C. Cir. 1986).

a. Following the required "pragmatic and flexible" approach, there are plainly instances in which so-called guidance marks the consummation of the decisionmaking process—*i.e.*, *Bennett*'s first prong. 520 U.S. at 178. That may be, for example, when an agency doesn't treat the purported guidance as "tentative or interlocutory" in subsequent proceedings. *Id.*; *cf. Sw. Airlines Co. v. U.S. Dep't of Transp.*, 832 F.3d 270, 274-75 (D.C. Cir. 2016) (finding purported guidance non-final when agency "invited" affected parties to brief the legal question addressed in the guidance). When an agency deems the guidance "conclusive," that "belies [any] claim that" the guidance is "not final." *Whitman*, 531 U.S. at 479.

Guidance authored or endorsed by a high-ranking official also often practically marks the consummation of the decisionmaking process. Indeed, this Court held in *National Automatic Laundry* that an "informal" "interpretation" (there, included in a letter) signed by "a board or commission, or the head of an agency" "presumptively" satisfies *Bennett*'s first prong. 443 F.2d at 701; *see also Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 636 (D.C. Cir. 2019) (finding finality where "no mere subordinate issued" the memorandum). And that conclusion was not limited to cabinet-level officials or their equivalents. *National Automatic Laundry* involved the Administrator of the Department of Labor's Wage and Hour

Division, 443 F.2d at 700, and this Court has also found finality in actions approved by an EPA Assistant Administrator, *see Cal. Cmtys.*, 934 F.3d at 631, and by the Department of Education's Acting General Counsel and Deputy General Counsel, *see Student Loan Mktg. Ass'n v. Riley*, 104 F.3d 397, 405 (D.C. Cir. 1997).

b. As to *Bennett*'s second prong, there is also little question that purported guidance can, and does, "determine[]" people's (or other regulators') "rights or obligations" and trigger "legal consequences." 520 U.S. at 177-78 (citations omitted); *see U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598-99 (2016) (listing the agency action's "bind[ing]" effect on a different agency as a "legal consequence[]" under *Bennett* (second set of brackets in original)). So-called guidance certainly might "command[]," "require[]," "order[]," or "dictate[]" particular behavior, *Nat'l Mining Ass'n*, 758 F.3d at 252, or "expose[]" a party to future consequences, *see Sackett v. EPA*, 566 U.S. 120, 126 (2012) ("double penalties in a future enforcement proceeding"). Or it might shield a regulated entity from liability (even only in part). *Hawkes*, 578 U.S. at 598-99.

Again, the "practical effect" of supposed guidance is enough. *Sierra Club v. EPA*, 955 F.3d 56, 64 (D.C. Cir. 2020). An agency's "purport[edly] … authoritative interpretation of a statutory provision" could force regulated entities to choose between "costly compliance" and "the risk of serious civil and criminal penalties" for noncompliance. *Ciba-Geigy*, 801 F.2d at 438-39 (citing *Abbott Labs.*, 387 U.S.

at 152). That Hobson's choice is sufficient. Thus, this Court has "repeatedly held" that "an agency's interpretation of its governing statute, [issued] with the expectation that regulated parties will conform to and rely on this interpretation, is final agency action fit for judicial review." *Id.* at 438 (citation omitted); *see John Doe, Inc. v. Drug Enforcement Admin.*, 484 F.3d 561, 566 (D.C. Cir. 2007) (citing *Ciba-Geigy* for finality analysis).

**B. The Purported CCR Guidance Constitutes Final Agency Action Subject to Immediate Judicial Review**

1. The Purported CCR Guidance is final agency action.

a. There are numerous indications that the Purported CCR Guidance marked the consummation of EPA's decisionmaking process. *Bennett*, 520 U.S. at 178. For one thing, the actions were taken by a high-ranking official and received the "endorse[ment]" of EPA's Administrator. *See Student Loan Mktg.*, 104 F.3d at 405. The press release states that "the U.S. Environmental Protection Agency" "is taking several *actions*" (including "putting several facilities on notice regarding their obligations" under "CCR regulations"), Pet. App. 12-13 (emphasis added), and endorses decisions signed by the Acting Assistant Administrator in charge of the Office of Land and Emergency Management.[4] That is similar to *National Automatic*

---

[4] *See* 42 U.S.C. § 6911(a) (identifying Assistant Administrator as "head[]" of Office of Solid Waste); 40 C.F.R. § 1.47 (noting that Office of Solid Waste is also referred to as Office of Land and Emergency Management).

*Laundry*, in which this Court deemed "authoritative" and final the division administrator's informal letter, which answered a request for a legal opinion regarding particular applications of the Fair Labor Standards Act. 443 F.2d at 692, 697, 702. Indeed, the press release goes further by quoting EPA Administrator Regan's enthusiastic prediction that "[t]oday's *actions* will help us protect communities and hold facilities accountable." Pet. App. 13 (emphasis added).

Moreover, the Purported CCR Guidance evidences a settled agency position—one relied on by multiple EPA Region offices in the following months. Pet'rs' Br. 25-26. Such agency-wide uniformity is yet another indication of finality. *See* Anthony, *supra* at 1329 (noting "practical binding effect" of document "issued at headquarters [and] administered in the field"); *cf. Appalachian Power*, 208 F.3d at 1022 ("the elements of the Guidance petitioners challenge consist of the agency's settled position"). These views were not "tentative," *Nat'l Automatic Laundry*, 443 F.2d at 701, or open to debate, *see also MediNatura*, 998 F.3d at 939 (no finality because each party had "an opportunity to be heard" and "submit [favorable] evidence"). The agency referred unit operators (including some Petitioners) to the press release, notified state agencies of facilities where CCR may be in contact with groundwater, and explained to those agencies EPA's position as articulated in one of the January 11 proposed decisions. Pet'rs' Br. 24-26. And in November, EPA doubled down on its position through a final denial of an extension request and an

accompanying press release, *id.* at 27, further confirming that the "earlier decision was conclusive." *Whitman*, 531 U.S. at 479.

b. The Purported CCR Guidance also created legal obligations for Petitioners. *Bennett*, 520 U.S. at 178. EPA's goal in issuing the Purported CCR Guidance was, as its press release stated, to "[b]ring" regulated "[f]acilities into [c]ompliance." Pet. App. 14; *see Ciba-Geigy*, 801 F.2d at 438. EPA warned that it was "working with state partners to investigate compliance concerns at coal ash facilities across the country," Pet. App. 14, in the pursuit of "hold[ing]" non-complying "facilities accountable," *id.* at 12; *see Sackett*, 566 U.S. at 125-26. In light of EPA's and private citizens' enforcement powers, the Purported CCR Guidance thus "exposes" Petitioners to increased liability through a new theory of per se noncompliance. *Sackett*, 566 U.S. at 126; *see* Pet'rs' Br. 53; Compl. ¶ 23, *Mobile Baykeeper, Inc. v. Ala. Power Co.*, No. 1:22-cv-382-KD-B (S.D. Ala.), ECF 1 (complaint filed Sept. 26, 2022) ("[A] coal ash impoundment cannot be capped in place with coal ash in contact with groundwater[.]" (citing the Purported CCR Guidance)).

Similarly, the Purported CCR Guidance created legal obligations for other regulators. *See Hawkes*, 578 U.S. at 598-99; *Bennett*, 520 U.S. at 178. In *Bennett*, a decision by the Fish and Wildlife Service determined "rights or obligations" because it constrained another federal agency—the Bureau of Reclamation. 520 U.S. at 157-58, 170. The Service's action "alter[ed] the legal regime to which the

[Bureau was] subject" and was "virtually determinative" of the Bureau's future decisionmaking on a particular matter. *Id.* at 169-70. Here, EPA's understanding of CCR unit operators' obligations under federal law informs the establishment of the floor for state regulation of solid waste management. 42 U.S.C. § 6907(a)(3). States cannot disregard the Purported CCR Guidance. Indeed, EPA's messaging to state agencies (*see, e.g.*, Pet. App. 19; Pet'rs' Br. 25-26, 54) communicates an expectation that state-level decisionmakers will follow EPA's lead. *Cf. Nat'l Mining Ass'n*, 758 F.3d at 253 (no finality where state agencies were "free to ignore" EPA's request); *Sierra Club*, 955 F.3d at 60, 63-64 (EPA guidance, which "preserve[d]" state permitting authorities' "discretion," was not final; permitting authorities were "free to completely ignore" guidance).

2. There are no other reasons to deny judicial review. No statute precludes review, nor is there any alternative adequate remedy in court. *See* 5 U.S.C. § 704. To the contrary, RCRA channels all "judicial review of final regulations promulgated pursuant to this chapter" through the APA's judicial-review provisions. 42 U.S.C. § 6976(a). Nor are there prudential reasons to delay. *See Abbott Labs.*, 387 U.S. at 152-53. Petitioners explain (at Br. 57) that the Purported CCR Guidance "will impose massive and irrevocable costs on CCR units across the country."

### III. Framing Agency Action as Guidance Is Not Sufficient to Escape Notice and Comment

#### A. Purported Guidance That Creates Binding Norms Is a Legislative Rule Subject to Notice and Comment

Agency action can generally be divided "into three boxes: legislative rules, interpretive rules, and general statements of policy." *Nat'l Mining Ass' n*, 758 F.3d at 251. And as noted above, "[l]egislative rules generally require notice and comment, [while] interpretive rules and general statements of policy do not." *Id.*

But the category into which an agency action falls is not determined simply by what the agency calls it. "It is well-established that an agency may not" opt out of notice and comment "by labeling" a legislative rule as "a mere interpretation" or a general statement of policy. *Appalachian Power*, 208 F.3d at 1024. The agency's characterization of the action—though "relevant"—marks the beginning, not the end, of the inquiry. *Gen. Motors Corp. v. Ruckelshaus*, 742 F.2d 1561, 1565 (D.C. Cir. 1984) (en banc).

The determination is ultimately based on the substance of the agency action, as well as its legal and practical consequences. "The most important factor concerns the actual legal effect (or lack thereof) of the agency action in question on regulated entities." *Nat'l Mining Ass'n*, 758 F.3d at 252. Important too for so-called guidance is any "post-guidance event[]" that demonstrates whether the agency "has applied" its guidance like a legislative rule. *Id.* at 253.

1. Purported guidance constitutes an interpretive rule only if it resolves textual indeterminacy latent in a pre-existing statute or regulation. *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997). It must be "drawn" "tightly" "from the actual language of the statute" or legislative rule being interpreted, *id.* (citation omitted), and engage in "a process reasonably described as interpretation," *Hoctor v. USDA*, 82 F.3d 165, 170 (7th Cir. 1996) (discussed favorably in *Catholic Health Initiatives v. Sebelius*, 617 F.3d 490, 495-96 (D.C. Cir. 2010)). Put simply, the purported guidance must take a statute or regulation whose meaning is in some doubt and provide clarification. *Id.*; *see Cent. Tex. Tel. Coop., Inc. v. FCC*, 402 F.3d 205, 212 (D.C. Cir. 2005). Courts may enforce the interpretation, but the interpretive rule itself carries no legal force. *Perez*, 575 U.S. at 104 n.4.

2. For purported guidance to be a general statement of policy, it must "advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1109 (D.C. Cir. 1993) (citation omitted). General statements of policy have no "present-day binding effect" and do not deprive regulators of discretion to disagree. *McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1320 (D.C. Cir. 1988) (citation omitted). Regulated entities must remain free to challenge that policy in administrative proceedings. *Pac. Gas*, 506 F.2d at 40.

3. In contrast, supposed guidance that has the "force and effect of law" is actually a legislative rule (sometimes called a substantive rule). *Perez*, 575 U.S. at 96 (citation omitted). Legislative rules establish "binding norm[s]," *Pac. Gas*, 506 F.2d at 38 (footnote omitted), or "rights" and "obligations," *United States v. Picciotto*, 875 F.2d 345, 348 (D.C. Cir. 1989). Like the violation of a statute, a violation of a legislative rule supplies the basis for enforcement proceedings or other adverse consequences, such as the denial of a permit. *Pac. Gas*, 506 F.2d at 38. Thus, this Court has recognized that the following hallmarks indicate that purported guidance is actually a legislative rule.

*First,* "in the absence of the [supposed guidance,] there would not be an adequate legislative basis for enforcement action or other agency action." *Am. Mining Cong.*, 995 F.2d at 1112; *see also Picciotto*, 875 F.2d at 346-47. Or similarly, the purported guidance denies regulators "discretion" so that the regulators need only depend on the purported guidance to justify their later actions. *McLouth Steel Prods.*, 838 F.2d at 1320. Absent the purported guidance, they would need to come forward with "evidence and reasoning" for their decisions. *Pac. Gas*, 506 F.2d at 38.

*Second,* the so-called guidance draws a bright line as a means of implementing a flexible standard. *Catholic Health Initiatives*, 617 F.3d at 495 (following *Hoctor*, 82 F.3d at 170). For example, it is not merely guidance when an agency creates

"'flat' rule[s]" to implement a standard like "reasonable costs." *Id.* at 496 & n.6 (citation omitted); *Am. Mining Cong.*, 995 F.2d at 1110. Nor is it mere guidance when an agency codifies specific applications of a standard. *Catholic Health Initiatives*, 617 F.3d at 495.

*Third,* the supposed guidance "effectively amends a prior legislative rule." *Am. Mining Cong.*, 995 F.2d at 1112; *see id.* at 1109-10. Because legislative rules have the force of law, only subsequent rules of equal legal force may undermine them. *See Perez*, 575 U.S. at 103.

### B. The Purported CCR Guidance Is a Legislative Rule

For many of the same reasons supporting the conclusion that the Purported CCR Guidance is final agency action (pp. 13-16, *supra*), the Purported CCR Guidance is not a general statement of policy but rather a legislative rule with the "force and effect of law." *Perez*, 575 U.S. at 96 (citation omitted). Again, EPA issued the Purported CCR Guidance explicitly to "[b]ring" CCR unit operators like Petitioners "into [c]ompliance." Pet. App. 14. And by statute, EPA is granted the power to "assess[] a civil penalty for any past or current violation" of RCRA obligations and "requir[e] compliance immediately." 42 U.S.C. § 6928(a)(1). Especially after EPA's admonition that it would "hold" non-complying "facilities accountable," Pet. App. 12, it was reasonable to "believe that failure to conform will bring adverse consequences," *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland*

*Sec.*, 653 F.3d 1, 7 (D.C. Cir. 2011) (citation omitted); *see*, *e.g.*, Pet. App. 23, 44, and that EPA "expects [regulated entities] to fall in line," *Appalachian Power*, 208 F.3d at 1023. EPA's instructions to the Georgia Environmental Protection Division (at Pet. App. 19) to retroactively apply the Purported CCR Guidance further bely any claim that the Rule is a general statement of policy. *See Am. Mining Cong.*, 995 F.2d at 1109.

The Purported CCR Guidance is also not merely interpretive but rather draws bright lines from flexible standards. The preamble for the 2015 Rule acknowledged that CCR unit operators were to decide what method of closure "is appropriate for their particular unit," 80 Fed. Reg. at 21,412, using totality-of-the-circumstances type language with open-ended yardsticks like "to the maximum extent *feasible*." 40 C.F.R. § 257.102(d)(1)(i) (emphasis added). In contrast, the Purported CCR Guidance issues a "flat" command—contact with groundwater means no closure in place—that converts the 2015 Rule's relative performance standards into a dispositive test, *Catholic Health Initiatives*, 617 F.3d at 496 n.6 (quoting *Hoctor*, 82 F.3d at 171), and eliminates a compliance option made available by the 2015 Rule.

There were similar circumstances in the Seventh Circuit's decision in *Hoctor*, which this Court has discussed approvingly. *See Catholic Health Initiatives*, 617 F.3d at 495-96. There, a regulation mandated that animal owners maintain a facility of "such strength *as appropriate* for the animals involved." *Hoctor*, 82 F.3d at 168

(quoting 9 C.F.R. § 3.125(a)) (emphasis added). The agency issued an "internal memorandum" declaring that only fences at least eight feet high were "appropriate" for "dangerous animals." *Id.* The court explained that the agency's "self-contained, unbending, arbitrary" eight-foot rule was a legislative rule. *Id.* at 171. So too with the Purported CCR Guidance. It is a legislative rule because it creates a bright line where there was not one before.

Petitioners make (at Br. 37-39, 41-44) other textual arguments showing that EPA has "effectively amend[ed]" the 2015 Rule, *Am. Mining Cong.*, 995 F.2d at 1112, rather than "ascertain[ed]" its "meaning," *Hoctor*, 82 F.3d at 170. These points further undermine the Purported CCR Guidance's status as merely interpretive.

## IV. Agencies Must Thoroughly Consider Reliance Interests and Afford Regulated Parties Due Process When Adopting New Legal Positions

Quite apart from EPA's violation of the APA's notice and comment requirements, EPA's supposed guidance must be "set aside" as arbitrary and capricious, or not in accordance with law, for several reasons. 5 U.S.C. § 706(2)(A); *Perez*, 575 U.S. at 105-06. First, though agencies may change their views from time to time, *e.g.*, *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016), when an agency does so, it must consider the public's reliance on the prior view, *Regents*, 140 S. Ct. at 1915. Second, and similarly, deference doctrines do not apply when an agency's changed interpretation of its own regulations may create unfair surprise.

*Kisor v. Wilkie*, 139 S. Ct. 2400, 2417-18 (2019). Finally, unless regulated entities had fair notice of the new agency position, the Due Process Clause bars an agency from using that position to punish past behavior. *United States v. Chrysler Corp.*, 158 F.3d 1350, 1354-55 (D.C. Cir. 1998).

### A. EPA Abandoned Its Prior Legal Position Without Adequately Taking Into Account Reliance Interests

1. The APA's prohibition on "arbitrary" and "capricious" agency action means that agencies must provide a "reasoned explanation[]" for all their actions, including guidance. *Flagstaff Broad. Found. v. FCC*, 979 F.2d 1566, 1569 (D.C. Cir. 1992). The requirements are well familiar. An explanation is legally insufficient if it "relie[s] on factors which Congress has not intended [the agency] to consider, entirely fail[s] to consider an important aspect of the problem, … runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

When an agency departs from a prior position, more is required. At baseline, the agency must demonstrate "awareness that it *is* changing position" and not "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). In addition, when the "prior policy has engendered serious reliance interests," the agency must provide

a more fulsome explanation than if it were writing on a "blank slate." *Id.* The agency *must* take those reliance interests into account even if they are not "legally cognizable" rights or even "[]justified." *Regents*, 140 S. Ct. at 1913-15. Unreasonable or less substantial reliance interests may be discounted, *see MediNatura*, 998 F.3d at 943, but not ignored, *Regents*, 140 S. Ct. at 1914.

2. EPA's failure to acknowledge its change in position in the Purported CCR Guidance, much less explore any reliance interests generated by the 2015 Rule, renders the former arbitrary and capricious. *Encino Motorcars*, 579 U.S. at 222. EPA claims (at Pet. App. 14) that its Purported CCR Guidance is merely a "re-state[ment of] EPA's consistently held position." But Petitioners explain (at Br. 35-44) that this position is anything but "consistently held."

Specifically, the Purported CCR Guidance is at odds with numerous statements in the preamble to the 2015 Rule. *See generally* Pet'rs' Br. 10-11, 36-37. There, EPA described closure through removal and relocation merely as its "prefer[ence]," over closure in place, "from the standpoint of land re-use and redevelopment." 80 Fed. Reg. at 21,412. EPA expressly declined to require this preferred method, recognizing "the expense and difficulty of such an operation" and that "both methods … can be equally protective, provided they are conducted properly." *Id.* It mandated that closure in place be "consistent with recognized and generally accepted good engineering practices," 40 C.F.R. § 257.102(d)(1)(v);

"incentiv[ized]" closure through removal and relocation of the CCR, 80 Fed. Reg. at 21,411, 21,425; *see* 40 C.F.R. § 257.102(i)(4); and imposed extra post-closure monitoring requirements (including, when necessary, corrective action) on CCR units closed in place to account for remaining risks, 40 C.F.R. §§ 257.96-.98, 257.104(a)(2); *see* 80 Fed. Reg. at 21,414, 21,426. But ultimately, the 2015 Rule "allows the owner or operator to determine" on a case-by-case basis which method "is appropriate." 80 Fed. Reg. at 21,412.

EPA thus was not writing on a "blank slate" in 2022. It had to say more. *Regents*, 140 S. Ct. at 1915. It was "required to assess whether there were reliance interests" on the 2015 Rule, "determine whether they were significant, and weigh any such interests against competing policy concerns." *Id.* It did not. Nowhere has EPA even acknowledged the reliance interests that Petitioners identify, including extensive and costly work undertaken since 2015 to meet a series of deadlines set in the 2015 Rule. Pet'rs' Br. 63-64.

### B. This Court Owes EPA's Legal Interpretations No Deference

To the extent this Court deems the Purported CCR Guidance an interpretation of an ambiguous regulation—and it should not, because there is neither a mere

interpretation[5] nor an ambiguous regulation[6]—EPA is owed no deference under *Auer v. Robbins*, 519 U.S. 452 (1997). *Auer* deference does not apply when a new interpretation would "create[] 'unfair surprise' to regulated parties." *Kisor*, 139 S. Ct. at 2418 (citation omitted). Unfair surprise includes "when an agency substitutes one view of a rule for another," or "impose[s] retroactive liability on parties for longstanding conduct that the agency had never before addressed." *Id.*

Deferring to the Purported CCR Guidance would create precisely the unfair surprise that makes *Auer* deference inappropriate. As discussed above and in Petitioners' brief, the obligations under the Purported CCR Guidance differ considerably from those EPA had previously indicated (and Petitioners had reasonably understood) were part of the 2015 Rule. *See also* pp. 21-22, *supra*. Courts "rarely give[]" deference when agencies change direction so dramatically. *Kisor*, 139 S. Ct. at 2418.

### C. EPA Cannot Constitutionally Apply the Purported CCR Guidance to Petitioners for Past Behavior

1. Finally, the Due Process Clause independently limits an agency's ability to apply new guidance retroactively. *Gen. Elec. Co. v. U.S. EPA*, 53 F.3d 1324, 1330 (D.C. Cir. 1995); *see* U.S. CONST. amend. V. Agencies may not "deprive a party of

---

[5] *See* pp. 21-22, *supra*.

[6] *Auer* deference applies only when a regulation is "genuinely ambiguous, even after a court has resorted to all the standard tools of interpretation." *Kisor*, 139 S. Ct. at 2414.

property by imposing civil or criminal liability" without fair notice—namely a statute or regulation "sufficiently clear to warn a party about what is expected of it." *Gen. Elec.*, 53 F.3d at 1328-29.

Two questions underlie the due-process inquiry. *First,* does applying the guidance deprive the regulated party of (life, liberty, or) property? Fines or forfeiture orders that are explicitly punitive fit the bill. *See FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 256 (2012) (*Fox II*); *Gates & Fox Co. v. Occupational Safety & Health Review Comm'n*, 790 F.2d 154, 156 (D.C. Cir. 1986) (Scalia, J.). So too do denials of applications, *Trinity Broad. of Fla., Inc. v. FCC*, 211 F.3d 618, 628 (D.C. Cir. 2000), and non-punitive orders that require the party to "expend[] significant amounts of money," *Chrysler*, 158 F.3d at 1354-55, when they are based on past non-compliance with the guidance.

*Second,* was the law (as set forth in the guidance) "ascertainably certain" from the text of the regulation being interpreted and in light of the agency's past practice? *See Trinity Broad.*, 211 F.3d at 628. Inconsistency within the agency suggests a lack of ascertainable certainty. *Gen. Elec.*, 53 F.3d at 1332. Parties cannot be expected to divine that an agency will, in the future, do "a 180-degree turn" in interpreting the law. *Fox II*, 567 U.S. at 250, 254-57 (citation omitted); *Chrysler*, 158 F.3d at 1357. When the agency makes such a shift, it may not use the resulting guidance to punish

parties for operating in reliance on the agency's earlier interpretation. *Fox II*, 567 U.S. at 258.

2. Holding Petitioners to the Purported CCR Guidance raises due process concerns. They have already developed closure operations in reliance on EPA's prior approach. Petitioners explain (at Br. 53) that the Purported CCR Guidance exposes them to significant compliance costs and penalties. Even denying them an extension of the closure deadline based on the Purported CCR Guidance, *see* 40 C.F.R. § 257.103, would trigger a serious due process objection. *Trinity Broad.*, 211 F.3d at 628. Furthermore, Petitioners' arguments (at Br. 35-44) regarding the proper interpretation of the 2015 Rule demonstrate that their obligations (as stated in the Purported CCR Guidance) were not "ascertainably certain." *Trinity Broad.*, 211 F.3d at 628. In short, the Purported CCR Guidance cannot be applied to Petitioners here.

## CONCLUSION

For the foregoing reasons, this Court should grant the petitions and vacate the

Purported CCR Guidance.

Dated:  December 21, 2022

Respectfully submitted,

s/ Elbert Lin
Elbert Lin
HUNTON ANDREWS KURTH LLP
951 East Byrd Street, East Tower
Richmond, VA 23219
elin@HuntonAK.com
(804) 788-8200

Nash E. Long
HUNTON ANDREWS KURTH LLP
101 South Tryon Street, Suite 3500
Charlotte, NC 28280
nlong@HuntonAK.com
(704) 378-4728

Andrew R. Varcoe
Stephanie A. Maloney
U.S. CHAMBER LITIGATION CENTER
1615 H Street, NW
Washington, DC 20062
(202) 463-5337

*Counsel for* Amicus Curiae

**CERTIFICATE OF COMPLIANCE**

The undersigned counsel states that this document complies with the Court's Order of October 5, 2022, because it contains 6,495 words, as counted by Microsoft Word, excluding the parts excluded by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1). This document also complies with typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface in 14-point Times New Roman font.

Dated: December 21, 2022

s/ Elbert Lin
Elbert Lin

# CERTIFICATE OF SERVICE

I certify that on this 21st day of December, 2022, a copy of the foregoing document was served electronically through the Court's CM/ECF system on all registered counsel.

Dated: December 21, 2022

s/ Elbert Lin
Elbert Lin